## Mott's Estate.

*Contract—Agreement as to stock of corporation—Federal taxes—Allowance on revision.*

Where, after a return of Federal taxes has been made by a corporation and an amount has been set aside to pay the taxes, the principal holder of the shares, in settlement of a dispute, transfers a number of shares to another person under an agreement that if the Federal taxes after revision are increased or reduced, an adjustment will be made, and it appears that the revision results in a tax less than that returned, the transferee of the shares will be entitled to an adjustment based on the difference between the amount of the return actually made and the amount set aside for the payment of the taxes, and not on the difference between the sum fixed by the Government and the amount set aside.

Exceptions to adjudication. O. C. Phila. Co., July T., 1925, No. 2133.

GEST, J., Auditing Judge.— . . . The claim of Robert A. Patton was presented by Mr. Pepper for $24,106.43, with 6 per cent. interest from June 11, 1921, claimed to be due under his contract with Mott, the testator.

In 1915, Mott was the owner of a large number of shares of the common stock of the Abram Cox Stove Company, incorporated under the laws of Pennsylvania, having $500,000 in preferred stock, par $100, and $656,650 of common stock, par $100. Mott was a large holder of the preferred stock, which, however, is not involved in this case, and owned practically all the common stock, being virtually the proprietor of the business.

On Feb. 13, 1915, the testator and Robert A. Patton made their contract, in writing, providing, in effect (1), that Mott should transfer 3500 shares of the common and voting stock to himself, Patton and James E. Mitchell as voting trustees for the next ten annual elections; (2) that Patton should be elected a director and remain a director until the termination of the agreement; (3) that Patton should be elected president of the company and remain president during the existence of the agreement, and that he should receive a stipulated salary, rising to $15,000, and for such years as the dividends of the company earned, declared and paid on the common stock shall exceed 5 per cent., he

shall receive, in addition to the annual salary of $15,000, a sum equal to one-half of such excess, which shall be paid to him equally in cash and common stock at par by the said Abram C. Mott. Where, however, in any year, after 5 per cent. dividend shall have been earned, declared and paid on the common stock, there are earnings in excess thereof, which it may be deemed advisable to carry to surplus, the one-half thereof to which Patton should be entitled as additional compensation should be paid to him by the said Abram C. Mott in the form of common stock of the company at par; (4) that Mott should receive a stipulated salary as chairman of the board of directors. The fifth paragraph of the agreement is as follows: "In the event of the said Robert A. Patton's connection with the said Abram Cox Stove Company ceasing for any reason, the said Abram C. Mott agrees forthwith to purchase at par from the said Robert A. Patton all common stock of the said company which he may have acquired under this agreement, payable in five equal annual installments with interest. It is also agreed that at any time during the life of this agreement, or upon the termination thereof, the said Abram C. Mott agrees to sell to the said Robert A. Patton, upon demand of the latter, a majority of the common stock of the said company at par, payable in five equal, annual installments, with interest thereon, commencing with the date of said purchase. Provided, that if this option be not exercised by said Robert A. Patton within one month of the termination of the agreement, it shall cease." (6) That Patton should devote his entire time to the service of the company and should not engage in any other business during his employment. And the contract further provided detailed methods of arriving at inventory values, etc., in the adjustment of profit and loss account and other matters which do not seem necessary to be recited.

As a result of this agreement, Patton had, in 1921, become the holder of 753 shares of stock; the agreement was then terminated, and, in accordance with the provisions of their contract, Patton would be entitled in final settlement, in addition to said stock, to such sum or its equivalent in stock as would represent his share of the profits for the year 1920, the last fiscal year before the termination of the agreement. The accountants, Lybrand, Ross Bros. & Montgomery, prepared a statement, dated Jan. 22, 1921, Exhibit 3 (testimony, page 27), of the corporate business for that year, showing profits in excess of dividend requirements of $144,586.98, of which Patton's share would be $72,293.49, or 722 shares of stock. In the calculation of the accountants, there was reserved for Federal income and excess profits taxes for the year ending Dec. 31, 1920, the estimated amount of $55,297.65.

A controversy arose between the parties, and they entered into another agreement, executed, as it was admitted, on June 11, 1921, Exhibit 2 (testimony, page 23), as follows:

"Agreement between Robert A. Patton and Abram C. Mott.

"Patton is the owner of 753 shares of the capital stock of the Abram Cox Stove Company. These shares were transferred to him by Mott in accordance with the contract of February 13th, 1915, a copy of which is hereto annexed. The parties are agreed that additional shares are deliverable by Mott to Patton under said contract, and the exact number so deliverable is fixed at 552, although a larger number was claimed by Patton. These 1305 shares represent Patton's capitalized past earnings, which he is desirous of converting into cash and which Mott is desirous of purchasing on the terms herein stated.

"1. Patton agrees to sell and Mott to buy 1305 shares of the common capital stock of the Abram Cox Stove Company.

"2. The purchase price of said shares is $130,500, which Mott will pay in instalments with 6% interest on deferred balances [as specified in clauses omitted].

[Paragraphs 3 to 6, which treat of deliveries, remedies for default in payment, etc., are omitted.]

"7. In case hereafter the Federal taxes assessed against the corporation for 1920 are increased or diminished an adjustment will be made in the total number of shares covered by this agreement corresponding to the effect of tax revision upon the corporate profits of that year.

"8. The execution of this agreement entitles Patton to an immediate transfer of said 552 shares, entitles Mott to an immediate transfer of the residue of shares held by the trustees under the agreement, operates further as a cancellation of said agreement of February 13th, 1915, and discharges Mott from all liability to Patton except as herein provided."

This agreement of June 11, 1921, has been fulfilled according to its terms by the transfer to the decedent or to his executors of four-fifths of the stock so held by Patton, the balance remaining to be paid for by Mott's executors on March 1, 1928, being $27,669.

The sum reserved in Exhibit 3 for Federal taxes was, as above stated, $55,297.65. The tax return made by the company to the Collector of Internal Revenue on March 14, 1921, for taxes for the year 1920, showed a balance of tax due of $23,341.76, Exhibit 5. Subsequently, in August, 1924, the Commissioner of the United States Internal Revenue (after several intermediate reassessments, in accordance with the custom of the Revenue Department of the United States Government) finally revised the tax liability of the company as stated in Exhibit 6 (page 29 of the testimony), the certificate showing that the correct taxes for 1920 were $7085.79, and it would appear from the evidence that the overpayment of tax was refunded. There was also offered in evidence a letter from Mr. Pepper to Mott, the testator, dated Jan. 31, 1925, Exhibit 7 (page 33 of the testimony), in which, after reciting certain facts concerning a statement of Lybrand, Ross Bros. & Montgomery, relating to the taxes of the Abram Cox Stove Company for the year ending Dec. 31, 1920, Mr. Pepper stated that he had advised Mr. Patton that, under paragraph seven of the agreement of June 9, 1921, Mott was indebted to Patton for an additional sum of at least $2781.74, and that this sum should be increased to $5320.24 if an item of $5077.11 was not properly chargeable to the year 1920. When this letter was offered in evidence, Mr. Pepper stated (page 15 of the testimony): "I have no objection to the admission of this letter, merely calling attention to the fact that the reduction in the tax was accomplished by successive steps. As each may have been communicated to us, either directly or indirectly, we claimed our equity in each reduction. I make this statement because I do not want any implication to be drawn from this letter that the $5000 refund was the limit of our claim."

Upon the evidence in the case, Mr. Pepper claimed, in behalf of Patton, the sum of $24,106.43, arrived at as follows: The amount reserved for Federal taxes, in Exhibit 3, was $55,297.65, while the amount finally determined to be actually due by the revision of the United States Commissioner was $7085.79, leaving $48,211.86, of which one-half, due Patton, is $24,105.93 (there was an immaterial discrepancy in the calculation, it being stated in argument that the actual amount finally paid to the United States for 1920 taxes was $7084.78).

Counsel for Mr. Patton, the claimant, based his argument on paragraph seven of the compromise agreement of June 11, 1921, and claimed that when

Mott's Estate.

he received 552 shares in 1920, he should have received 241 in addition (that is, the equivalent of the common stock at par of $24,105.93), and as four-fifths of Mott's liability under that agreement has been discharged by performance, Patton is now entitled to four-fifths of his claim in cash, with interest at 6 per cent. from June 11, 1921, to the date of payment, and will also be entitled, on March 1, 1928, to the remaining one-fifth, with interest to that date.

The argument on the other side is, substantially, as follows: It was understood by both parties that, on account of the different methods followed by the company's accountants and the taxing officials in computing the net income of the company, the Federal taxes would be materially less than the reserve of $55,297.65; that, on March 14, 1921, the company filed its tax return, under oath, showing that the tax would be $23,341.76 as against the reserve of $55,297.65, and on this basis the balance of net income, after dividend requirements, would be $73,571.74, of which Patton's half would be $36,785.87, or 367 shares of stock, and, moreover, the accountants' report of April 15, 1921, Exhibit 4, showed an estimated allowance of $33,500 as the correct amount of Federal taxes for 1920. The argument, therefore, was that, on June 11, 1921, the parties compromised their differences by agreeing that the exact number of deliverable shares should be fixed at 552, and as the parties, in arriving at this compromise figure of 552 shares, in the agreement of June 11, 1921, had before them the tax return made by the company in the previous March, which superseded the estimate of $55,297.65 by an actual assessment of $23,341.76, it follows that paragraph seven was intended to provide for an increase or decrease over or under that amount. This argument leads to the result that, under paragraph seven, as thus interpreted, Patton was entitled to 81 shares more than he received; that is, the original assessment on the tax return was $23,341.76, deduct the correct liability of $7085.79, leaving a net adjustment of $16,255.97, of which Patton's one-half is $8127.98.

From this resumé of the facts of the case and the arguments of counsel, which, perhaps, might have been stated more concisely, it appears that the question at issue is a very narrow one, viz., where, in paragraph seven, the parties provided, "In case hereafter the Federal taxes assessed against the corporation for 1920 are increased or diminished an adjustment will be made in the total number of shares covered by this agreement corresponding to the effect of tax revision upon the corporate profits of that year," did the parties have in mind as the estimated taxes $55,297.65, as contained in Exhibit 3, or $23,341.76, as contained in Exhibit 5? The difficulty arises from the fact that the agreement of June 11, 1921, was a compromise agreement, and it does not appear from it in what way the number of 552 shares was determined upon, nor does it appear how or in respect to what the controversy arose between the parties which led to the compromise agreement. It does appear that the methods of accounting employed by the company's accountants in ascertaining the profits of the company in which Patton was interested under the original agreement of 1915 differed materially from those used by the Internal Revenue Office, and this, of course, affected the amount of tax to be assessed. (See Hood's testimony, pages 10, 11, etc., and the auditor's report, Exhibit 4.) It may be argued inferentially that these differences inhered in the allowances to be made for depreciation of plant and equipment, etc., in the calculation of profits, and such matters were commented on very fully in the arguments of counsel; but, after all, such matters throw little light on the interpretation of the contract. [The Auditing Judge held that Mr. Pepper's letter did not operate as an admission to restrict Patton's claim to the amounts stated therein and should be disregarded.]

Mott's Estate.

The difficulty in this case is, as above noted, that paragraph seven refers to the possibility that thereafter the Federal taxes should be increased or diminished, in which event a corresponding adjustment should be made in the total number of shares covered by the agreement. This agreement bore date June 11, 1921, and if it had stated the amount of the tax which at that time was in the mind of the parties when they agreed upon their compromise settlement, the matter would be plain enough. After a careful consideration of the facts and the arguments of counsel, I am led to the conclusion that when, on June 21, 1921, the parties entered into the compromise agreement, they must have had in mind the official return made by the company on March 14, 1921, a short time previous thereto, which tax return, Exhibit 5, was executed by Robert A. Patton, under oath, as president of the company, so that he well knew at that time the amount of taxes which, presumptively, at least, would be payable, viz., $23,341.76, and his affidavit, in the usual form, states that the return has been examined by him and to the best of his knowledge and belief was a true and complete return made in good faith for the taxable period as stated. Under paragraph seven, therefore, I am of opinion that Patton was entitled only to 81 additional shares, according to the calculation above set forth.

*George Wharton Pepper*, for exceptions.

*Joseph J. Brown* and *Henry P. Brown*, contra.

VAN DUSEN, J., Oct. 28, 1927.—Decedent had a written agreement with Robert A. Patton, whereby the latter served as president of a company of which decedent was principal stockholder, and was to receive from decedent, in addition to his salary, one-half the profits in excess of certain dividend requirements, payable in common stock of the company. In 1920 an accountant's report was prepared showing certain profits and that Patton was entitled to 772 shares. His right to all of these shares was disputed, and this dispute was settled by decedent giving him 552 shares, though he claimed a larger number.

The agreement of settlement was in writing, and it contained this additional clause, out of which this controversy arises:

"7. In case hereafter the Federal taxes assessed against the corporation for 1920 are increased or diminished an adjustment will be made in the total number of shares covered by this agreement corresponding to the effect of tax revision upon the corporate profits of that year."

To determine whether Federal taxes have been diminished, a starting point must be found; and as the agreement does not provide it, either in figures or precise definition, we must look elsewhere. Patton claims that it is the sum of $55,297.65, which was the reserve for Federal taxes set up in the accountant's report; and as the taxes were finally settled by the Government at $7085.79, he claims one-half the difference. Decedent's representatives claim that the starting point is the sum of $23,341.76, which was the figure fixed by Patton himself in his return as president of the company, made and filed before the settlement was arrived at; and they concede him the difference. The Auditing Judge adopted the latter view, and we agree with him.

The error of the exceptant's argument lies in assuming that the settlement agreement was drawn with the accountant's report always and solely before the parties as to the tax liability. There is no evidence of this, and as the claimant fails to sustain the burden which is on him, he must be satisfied with the concession by decedent's representatives of the lesser figure. As the income taxpayer's return is really a self-assessment, the language of the

greement, "in case hereafter the Federal taxes assessed against the corporation for 1920 are increased or diminished," more naturally refers to the figures of the return as the starting point. If the Government had stood on the return and made no refund, would assessed taxes have been diminished? Could it be said that in such case there had been any "tax revision?"

The exceptions are dismissed and the adjudication is confirmed absolutely.